# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**ATTORNEY FOR APPELLANT**

Cynthia M. Carter
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sean Patrick Hogan, <br> *Appellant-Petitioner*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent*. | January 28, 2020 <br><br> Court of Appeals Case No. 19A-PC-1057 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. 02D04-1710-PC-98 |

**Brown, Judge.**

[1]     Sean Patrick Hogan appeals the denial of his petition for post-conviction relief. We affirm.

## Facts and Procedural History

[2]     The relevant facts as discussed in Hogan's direct appeal follow:

> A.B. was born June 15, 1999 to J.B. ("Mother") and [A.B.'s father]. In 2001, Mother and Hogan, who was at that time approximately twenty-six years old, began dating. When A.B. was about two-and-a-half years old, she, Mother, and Hogan began living together on Springbrook Road in Fort Wayne, Indiana. A.B. had visitation with Father on Mondays and Thursdays and every other weekend. At some point in early 2003, Hogan and Mother had a child together, C.H.
>
> Hogan often watched A.B. and C.H. while Mother was at work. When A.B. was very young, Hogan introduced her to "the chair game," where Hogan would tie A.B. up to a computer chair "and see if [she] could get out." Tr. at 143. A.B. recalled, "He would just say if I could get out I could do whatever I wanted to do to him, and if I couldn't then he could do whatever he wanted to me." *Id.* at 145. Hogan always tied A.B. so securely that she couldn't escape. At first, Hogan would just tickle A.B. when she could not escape. One day, when A.B. was five years old and failed to escape, Hogan told A.B., "what he was going to do he could go to jail for so I couldn't tell anybody and that what he was going to do was going to make me feel like I had to pee." *Id.* at 144. A.B. recalled, "He put his mouth on my vagina." *Id.*
>
> A.B. recalled that Hogan's abuse became worse as she grew older. A.B. said she "grew up thinking it was okay, that everything was okay" because Hogan "told me he was in love with me." *Id.* at 147. The first time A.B. learned that Hogan's conduct was not normal was when she was in the third or fourth grade at school and saw a video "on like how stuff wasn't okay,"

and saw that other people "didn't have people calling them that much" or people who were "right by their sides" as she did. *Id.* at 148, 149.

While A.B. was growing up, Hogan made her watch pornographic videos and, when A.B. was eight or nine years old, Hogan made two videos in which he made A.B. lie on top of him while Hogan simulated having sex with her. *Id.* at 152. Hogan later made A.B. watch one of the two videos. Prior to 2010, handcuffs became a part of Hogan's "games." *Id.* at 155, 156. A.B. testified that if she did not want to do something with Hogan, he would use handcuffs to attach her to bars on the bed frame and "sometimes belts with [her] hands and [her] legs." *Id.* at 155. A.B. recalled that sometimes Hogan presented this behavior "more like it was a game" and that at other times, "it would be like, no, you have to do this." *Id.* at 156. A.B. testified that if she expressed unwillingness, Hogan "would get really mad and say I was like betraying him and stuff like that." *Id.* at 155. Hogan also would accuse A.B. of "cheating on him with somebody at [her] school." *Id.* Sometimes A.B. screamed in protest, but she said, "[I]f I put up a fight, there was just going to be more. There was just going to be a bigger fight and nothing was going to work out. Either way it was going to happen." *Id.* at 156.

In 2010, after living on Springbrook Road for eight years, Hogan, A.B., C.H., and Mother moved into a hotel for about a month and then moved into a home on Fifth Street in Fort Wayne. A.B. recalled that, when she was ten or eleven years old, Hogan "made me do stuff to him"; he made me "put my mouth on his penis," "put my hands on his penis," and "rub all over him." *Id.* at 151-52, 154. A.B. testified that while still living in Indiana, when she was younger than twelve years old, Hogan touched her "[a]ll over. My vagina, my breasts, my butt, everything." *Id.* at 163. When asked whether Hogan touched the inside or outside of her vagina, A.B. testified that Hogan used his fingers to touch her vagina "[i]n and out." *Id.* A.B. also testified that Hogan

would sometimes make her stand on an exercise machine in a position that allowed him to place his mouth on her vagina.

On returning home from work one evening, Mother found A.B. in bed with Hogan. Hogan was cuddling A.B. and had his legs draped over her. Mother ended her relationship with Hogan and moved to Florida in May 2011, taking both A.B. and C.H. with her. A.B. was eleven when the family moved to Florida. Mother testified that, at that time, Hogan called A.B. about "35 times a day," "and he would text her all day long." *Id.* at 374. Hogan also sent frequent messages to A.B.'s Facebook page, in an effort to get her attention. *Id.*

While living in Florida, A.B. and C.H. would return to Indiana periodically to visit their respective fathers. These visits occurred during winter break in 2011, during spring break in 2012, and during the summer of 2012. When A.B. returned to Indiana for visits, she visited Hogan's house in order to see C.H. During those visits, Hogan made A.B. sleep in his bed and compelled her to engage in oral sex. One night, A.B., wanting to sleep in her sister's room, refused to sleep in Hogan's bed. At two o'clock in the morning, Hogan came into the room with "hot water and he poured it all over me, just because I didn't want to sleep in his room." *Id.* at 165. A.B. left C.H.'s room and went to sleep in Hogan's room.

During the summer of 2012, a custody battle resulted in A.B. and C.H. moving to Fort Wayne to live with their respective fathers. Thereafter, Hogan had regular contact with A.B. Father later explained that he helped Hogan get a job with Father's employer so that Hogan could "get on his feet," and he allowed Hogan to spend time with A.B. because Father thought that Hogan "always would take care of her and be there for her." *Id.* at 455, 456.

When A.B. was in middle school, Hogan would drop off and pick up A.B. from school. Hogan was listed as one of the contacts to call in case of an emergency. Hogan frequently called

and texted A.B. at school. At trial, A.B.'s science teacher recalled that Hogan's constant texting and calling disrupted A.B. in school, leaving A.B. "agitated and upset." *Id.* at 296, 298. The science teacher also remembered that A.B. was repeatedly called out of class to speak to Hogan on the phone in the front office. The science teacher heard some of the messages that Hogan left for A.B., "saying things that you don't say to a thirteen year old." *Id.* at 301. In one message, Hogan said, "[Y]ou're my baby, I can't live without you." *Id.*

The school's principal personally recalled that Hogan called the school "[s]ometimes multiple times in a week[, s]ometimes multiple times in a day." *Id.* at 315. The principal recalled that the volume of calls from Hogan to A.B. was unusually high and that Hogan also sent her gifts to school. When A.B. was not at school, Hogan would constantly call or text her while she was with friends or relatives. A.B.'s aunt went through A.B.'s cell phone and saw photographs from Hogan of girls wearing panties and short tops. In each of the photos, the girl had a pierced belly button, which A.B. said was something Hogan wanted her to get. *Id.* at 269.

Bridgette, the mother of one of A.B.'s friends, recalled that it was "kind of creepy" how often Hogan called A.B. *Id.* at 414. When Bridgette told A.B. to turn off her phone, A.B. replied, "[N]o, [Hogan] will get mad, I can't." *Id.* at 415. When Bridgette discussed this with Hogan, he told her that A.B.'s father was the "bad dad" and that Hogan was "the good dad" who was trying "to keep [A.B.] on line." *Id.* Bridgette testified that Hogan was not a father figure, but, instead, "acted like a jealous boyfriend." *Id.*

Around Christmas 2012, when A.B. was thirteen, Hogan secretly gave her a ring and told her it was her engagement ring. *Id.* at 182. In the spring of 2013, Hogan made A.B. stay over at his house at least twice a week. *Id.* at 168. A.B. had to sleep in Hogan's bed, and he would make her perform oral sex on him. Hogan would occasionally ejaculate on her and told A.B. that it

would make her skin soft. *Id.* at 170. Hogan always told A.B. that he was in love with her, and that she "had to have a baby with him by the time she was seventeen." *Id.* at 182. One night, when A.B. was thirteen years old, Hogan woke her up. *Id.* at 170-71. A.B. realized that Hogan was about to abuse her again, later explaining "after that happens for so long you just know." *Id.* at 171. Hogan disrobed and partially penetrated A.B.'s vagina with his penis. *Id.* A.B. felt pain and screamed, and Hogan rose and left the room. *Id.* C.H. was downstairs playing a video game. *Id.* at 172. C.H. responded to A.B.'s scream, asking what was wrong, but A.B. told C.H. that she had merely stubbed her toe. *Id.*

A.B. recalled that she took pains to hide from C.H. what Hogan was doing because Hogan was C.H.'s dad, and since Mother "was not a very good mom," A.B. said that she had "practically raised [her] sister." *Id.* at 172-73. A.B. did not tell Mother about the abuse because she did not trust her. *Id.* at 174. Additionally, A.B. was coerced into silence by Hogan's threats, recalling that "[Hogan] always told me that he would kill my dad, he would send me back to Florida with my mom . . . ." *Id.* at 175. A.B. was frightened for Father, later saying, "I love my dad with all my heart. He's the only person . . . if I didn't have him I would be in like foster care right now." *Id.* at 176. A.B. was also afraid of returning to Florida, saying, "[M]y mom was a really bad mom. She was an abuser. She wasn't a mom to me at all." *Id.* Hogan also promised A.B. that if she told anyone what he was doing, "he would make it look like I did it, like it was my fault." *Id.* at 174-75.

A.B. eventually told her guidance counselor, explaining, "I was just fed up with everything, I couldn't take it anymore, I couldn't take him calling me so many times, I couldn't take not being able to live a life as a teenager." *Id.* at 175. The guidance counselor notified Child Protective Services, A.B.'s principal, and Father. *Id.* at 277, 278. A.B. showed her guidance counselor photographs on her cell phone that Hogan had sent her, one of

which appeared to be an erect penis, covered by underwear. Meanwhile, Hogan called the school, and the principal told Hogan that he was no longer on A.B.'s contact list. *Id.* at 317. Hogan then called A.B.'s cell phone. A police officer took the call and told Hogan not to call again.

Detective Bridget Glaser of the Fort Wayne Police Department interviewed Hogan and, later, retrieved Hogan's cell phone from his vehicle with Hogan's consent. Hogan's cell phone was in four pieces – the "flip phone" itself was in two pieces and the battery and SIM card had both been removed. *Id.* at 537. Forensic examination of Hogan's cell phone revealed that approximately 4,000 images had been deleted from the phone's memory. *Id.* at 512.

Hogan was charged with four counts of Class A felony child molesting, four counts of Class C felony child molesting, and one count of Class D felony dissemination of matter harmful to minors. The offenses were alleged to have occurred "[s]ometime during the period of time between the 15th day of June, 2004 and the 31st day of May, 2013." Appellant's App. at 15-23. A partial log of A.B.'s text messages was introduced at Hogan's trial. That log revealed dozens of text messages sent from Hogan to A.B. On May 11, 2013, Hogan had texted A.B. twenty-five times, sending messages like, "Where is my pic," "You have 2 min to call me or i call your teacher," and "Dumb ass." State's Ex. 7. On May 25, 2013, Hogan texted A.B. thirty-six times within seven minutes with the one-word message, "Hello." *Id.* Another message Hogan texted on this day was, "When you get ready for bed i come get you:)." *Id.* On May 30, 2013, the day A.B. reported the abuse, Hogan texted "See you in court" seven times within eleven minutes. *Id.* The following day, Hogan texted A.B. twice within five seconds, saying each time, "I called the police on your dad." *Id.* A search of Hogan's residence, pursuant to a warrant, uncovered a handcuff key. Tr. at 539.

*Hogan v. State*, No. 02A05-1404-CR-179, slip op. at 2-9 (Ind. Ct. App. January 15, 2015), *trans. denied*. The jury convicted Hogan as charged. *Id.* at 9. The court sentenced him to an aggregate sentence of 120 years. *Id.* at 10.

[3] On direct appeal, Hogan argued that his sentence was inappropriate and the trial court's application of the 2008 "credit restricted felon" designation to Counts II, III, and IV violated the constitutional prohibition against ex post facto laws. *Id.* at 2. We affirmed. *Id.*

[4] On October 25, 2017, Hogan filed a petition for post-conviction relief alleging he received deficient assistance from trial counsel, and the State and its investigators violated *Brady v. Maryland* and committed prosecutorial misconduct. On June 29, 2018, and August 17, 2018, the court held evidentiary hearings. Attorney Joshua Isaac Tourkow testified Hogan retained him to work on the case involving the custody of C.H., there was a related proceeding involving her half-sibling, A.B., he represented both of the fathers, Hogan was reported as an alleged abuser, and the abuse was unsubstantiated. He also testified he did not recall discussing the custody battle with Hogan's trial counsel.

[5] The court admitted a 2012 Department of Child Services ("DCS") report as Petitioner's Exhibit B. The report stated in part that DCS received a notification on July 23, 2012, of safety concerns regarding A.B. involving a witness observing Hogan grabbing A.B. "all over as in the groin and breast area." Petitioner's Exhibit B. The report also stated A.B. was interviewed by

Supervisor Andrea Goebel at the Center for Children on July 26, 2012, Supervisor Goebel asked her why she believed she was brought to the Center to be interviewed, A.B. stated "[b]ecause they think that my dad, Sean touched me sexually," and "[A.B.] denied that her stepfather had ever tongue kissed her, touched her groin area or her breasts" and "stated that no one has ever touched her inappropriately and stated that she feels safe around her dad, [A.] and her dad Sean." *Id.* The report concluded that the allegation was unsubstantiated.

[6] Attorney Samuel Bolinger testified he represented Hogan at trial, there was a plea offer by the State of forty years, and he advised Hogan that, after reviewing the evidentiary package, there was a substantial risk to him to go forward with trial and he could face a "very, very lengthy jail time." Post-Conviction Transcript Volume II at 36. He testified that he conducted a telephonic deposition of C.H. who was in Florida, he moved to admit the deposition at trial, and the trial court denied the motion. When asked why he thought C.H. would have been a favorable witness, he answered: "She may have attested that the allegations that A.B. made never occurred. But at the same time she was never notified of those, what I'll call contacts, or allegations, so when asked point blank in her deposition, she simply responded as I read down the list of allegations that that's how she responded." *Id.* at 42.

[7] Hogan's counsel introduced and the court admitted a transcript of C.H.'s deposition as Petitioner's Exhibit G. In her deposition, C.H. indicated she did not observe Hogan touch A.B. on her buttocks, breasts, or vagina. C.H. also

stated that A.B. slept in Hogan's bed, and that she, C.H., slept on the floor when A.B. would sleep in the bed with Hogan.

[8] The court admitted a taped interview of C.H. as Petitioner's Exhibit L. During the interview, C.H. stated A.B. visited her, A.B. had her own room but she slept on the couch a lot, A.B. sometimes slept in Hogan's room, and they slept on the floor or on the bed when they slept in Hogan's room. When asked if there were ever times A.B. slept in Hogan's room without her, she answered in the negative. She indicated there were times when A.B. slept in the bed with Hogan but she, C.H., would get in the middle.

[9] Hogan testified that his trial counsel visited him in jail four times, he did not know where his daughter, C.H., was once he was arrested, and he wanted his trial counsel to use C.H. as a witness because "whenever . . . A.B. would come over and wherever A.B. went C.H. was there, no matter what." Post-Conviction Transcript Volume II at 94. He testified he never had a pair of handcuffs and "would never own a pair let alone put a pair on somebody." *Id.* at 95.

[10] On April 8, 2019, the court denied Hogan's petition. The court's order provides:

### FINDINGS OF FACT

\* \* \* \* \*

6. A.B. briefly testified at trial about "the custody battle." Tr. 166. In a discussion at the bench outside the hearing of the jury,

the Court later ruled that "[d]elving into the nature of the custody fight is irrelevant."[1] Tr. 384. Nevertheless, at the post-conviction hearing, the Court allowed Petitioner to present testimony about the custody dispute from Attorney Joshua Tourkow, who represented both Petitioner and A.B.'s father in successfully obtaining custody of C.H. and A.B., respectively. Attorney Tourkow mentioned that there had been allegations of abuse, but did not suggest that A.B. could have fabricated or repeated such allegations in an effort to influence the outcome of the custody dispute. In regard to the possibility that A.B. might have had a motive to do so, it is relevant that A.B. testified at trial that she had been induced to deny the abuse by Petitioner's threats, the "big one" of which was that "he would send me back to Florida with my mom[.]" Tr. 175. A.B. explained that this was such a big threat "[b]ecause my mom was a really bad mom. She was an abuser. She wasn't a mom to me at all." Tr. 176. As to her father, in contrast, she testified that "I love my dad with all my heart." *Id.*

7. A.B. testified at trial that "in the summer that they got custody of me, which was 2012, there was allegations made against Sean and I denied everything[.]" Tr. 174. A report dated September 5, 2012, of an investigation of alleged child abuse or neglect by the Indiana Department of Child Services (DCS), indicated that A.B. did, in fact "den[y] everything." Specifically, the report stated that "[A.B.] denied that her stepfather [Mr. Hogan] had ever tongue kissed her, touched her groin area or her breasts. [A.B.] stated that no one has ever touched her inappropriately and stated that she feels safe around her dad, Alan and her dad [*sic*] Sean [Hogan]." Petitioner's Exhibit B. Attorney Bolinger did not cross-examine A.B. about her admitted denial of "everything." A.B. also testified at trial that, before she disclosed the abuse to her counselor, her counselor had previously asked

---

[1] Most of the bracketed text appears in the post-conviction court's order.

her "if he [Petitioner] had ever done anything to me"; A.B. "denied it" and said "I don't know what you're talking about." Tr. 175. She explained that she denied it because "[h]e made so many threats to me, and I was scared"; she went on to elaborate at some length about the threats. Tr. 175-176.

8. Attorney Bolinger did not subpoena C.H. to testify at trial, and unsuccessfully ordered a telephonic deposition of C.H. in lieu of live testimony. In her deposition (Petitioner's Exhibit G), C.H. testified [that she did not see Hogan touch A.B. on her buttocks, breasts, or vagina, answered affirmatively when asked if A.B. ever slept in Hogan's bed, and that she, C.H., slept on Hogan's floor while Hogan slept in bed with A.B.]. In a recorded statement, C.H. had stated that she sometimes did sleep in the bed with A.H. and Petitioner, but she (C.H.) always slept in the middle.

9. In a letter dated November 1, 2013, Attorney Bolinger recommended that Petitioner accept a plea agreement. The reasons for Attorney Bolinger's recommendation were basically that the evidence against Petitioner was quite strong, the risk of going forward was great, Petitioner was potentially facing over 140 years in prison, and the plea agreement would provide for a sentence of 40 years. Petitioner's Exhibit F, at 1-2. Petitioner claimed that he was innocent and declined to accept the State's plea offer.

* * * * *

11. Petitioner denied that any of the charged offenses had occurred. Tr. 564-588. A.B. was like a daughter to him, he said, and he disciplined her. Tr. 564, 567. She programmed his phone, and he made repeated calls to make sure she was where she was telling him she was. Tr. 569. He called her school often because, he said, she was missing a lot of time. Tr. 571. He also texted her a lot to verify that she wasn't getting in trouble [Tr. 577]; he said she kept getting into fights at school, 12 to 14 of them [Tr. 600]. He sent her one or three pictures of girls with

belly rings in order to instruct her that she was not to get one, although her dad had said she could. Tr. 586 (one picture), 598 (three pictures). He grounded her [*id.*]; he said she got annoyed and angry when he disciplined her [Tr. 568], and in the spring of 2013 she got mad because she went to a friend's house where she was not allowed to go [Tr. 588]. She cried a lot, Petitioner said, and she was a "drama queen." Tr. 588. He did not know whether he had texted her saying that he "felt like shit," "like a used dirty tampon," and he felt "used and lied to." Tr. 605. He did not recall having texted her saying that he felt "worthless and like a shitty sucker taken advantage of all the time, lies and love, too much hurt, in pain, too much hope she would do that again, too stupid to know the truth, the sucker." Tr. 605-606. He knew nothing about a text, apparently sent by him to A.B., saying "when you get ready for bed, I come get you." Tr. 606-607. Finally, he acknowledged that he had told Detective Bridget Glaser that "you need to go check him [A.B.'s father] out because he's the one that's obsessed with her. He wants to tattoo himself . . . all the way down to his butt with her." Tr. 608-609. Witness Amy Jacobowitz testified that Petitioner's response to the allegations against him was as follows: "When I told him that, you know, he was going to be on administrative leave [from work as a result of the investigation of the allegations], he just looked at me and said, I didn't do anything, she just . . . [A.B.] is just mad at me for grounding her." Tr. 438.

12. Guidance counselor Anita Nevils, when asked at trial whether A.B. had attendance problems or was skipping school, said, "No. None what so ever." Tr. 271. She also testified that A.B. was not "in a lot of trouble with fights or things at school" [Tr. 271-271] and that it was not common for parents to call their children at school to see where they were [Tr. 286]. Science teacher Debra Calvin testified that A.B. was a very good, bright student, who did not have excessive absences from her science class and did not have disciplinary problems or fights. Tr. 294-295. School Principal Matt Schiebel, though he acknowledged that he did not "monitor all 900 of our kids," likewise testified

that A.B. was not getting into fights or having disciplinary problems at school, and he did not recall A.B. having an extreme attendance problem. Tr. 315. He also testified that he heard a voice mail message from A.B.'s phone from a person who appeared to be Petitioner, containing "a lot of love of my life type of comments that to me just seemed not appropriate for a student." Tr. 318. A.B.'s best friend [H.] testified that A.B. told her "once in third grade he [Petitioner] molested me" and that A.B. "begged me not to tell anyone, so I didn't." Tr. 404. A.B.'s friend [B.] testified that Petitioner sometimes touched A.B. on her butt [Tr. 421], and that once A.B. said to her, "Oh my God, Sean [Petitioner] just sent me a picture" which, [B.] observed, showed a naked lady with her breasts visible [Tr. 424].

## CONCLUSIONS OF LAW

* * * * *

3. Had Attorney Bolinger done everything that Petitioner wishes he had done, the events of the original proceeding might have been different in the following ways. Additional evidence regarding the custody dispute might have been admitted, had the Court somehow been induced to change its ruling that "[d]elving into the nature of the custody fight is irrelevant" [Findings of Fact, ¶ 6]. The 2012 DCS report (Petitioner's Exhibit B) might have been offered to corroborate A.B.'s acknowledgment that she "denied everything" in 2012 [*id.*, ¶ 7]. C.H. might have given testimony consistent with her earlier statements [*id.* ¶ 8]. Attorney Bolinger might have refrained from recommending that Petitioner accept the State's plea offer [*id.*, ¶ 9]. . . . For the following reasons, Petitioner has not shown a reasonable probability that the outcome of the original proceeding would have been different even if all these things had occurred.

4. Petitioner asserts that evidence regarding the custody dispute was "crucial to [his] defense" [Petitioner's Brief, at 7], but he appears to give no hint as to why this is supposed to be so. Hypothetically, evidence regarding a custody dispute might be

relevant if it tended to show that an alleged child victim had fabricated or repeated allegations of abuse in hope of influencing the outcome of the custody dispute, so as to reside with the parent preferred by the alleged victim. In the present case, however, A.B.'s testimony indicated that she strongly preferred her father (who, like Petitioner, lived in Fort Wayne) over her mother (who lived in Florida) [Findings of Fact, ¶ 6]. Allegations that Petitioner had abused her would have had no tendency to influence the dispute in favor of allowing her to reside with her father rather than her mother, and indeed might have had the opposite tendency – inasmuch as her father, living in the same city as Petitioner and regarding him as a trusted friend [*id.*, ¶ 5], had failed to prevent the alleged abuse. No evidence would suggest that A.B. was lying about which parent she preferred. For these reasons, evidence regarding the custody dispute would have done nothing to cast doubt upon the credibility of A.B.'s extremely detailed account, nor to affect the outcome of the original proceeding in any way.

5. Counsel will not be found ineffective for failing to present cumulative evidence. *Chupp v. State*, 509 N.E.2d 835, 839 (Ind. 1987). A.B. admitted at trial that, in 2012, she "denied everything" regarding allegations that Petitioner had abused her [Findings of Fact, ¶ 7]. The 2012 DCS report [Petitioner's Exhibit B] would simply have shown the same thing, that she "denied everything," and therefore would have been merely cumulative. Furthermore, her explanation of why she also denied any abuse by Petitioner when questioned by her counselor – i.e., that Petitioner had made many threats to her and she was scared [Findings of Fact, ¶ 7] – would have applied equally well to her denial of any abuse in the 2012 DCS investigation. Petitioner has made no showing that Attorney Bolinger could have done anything to increase the credibility of A.B.'s acknowledged denial of abuse in 2012, nor to decrease the credibility of her account at trial by further comparison with her denial in 2012. The 2012 DCS report, if presented at trial, would have done nothing to affect the outcome.

6. C.H.'s deposition established that C.H. did not remember having observed anything relevant to Petitioner's case [Findings of Fact, ¶ 8]. Had C.H. given the same testimony at trial, any effect of such testimony upon the outcome could only have arisen from an inference that events not remembered by C.H. did not occur because she would have observed and remembered them had they occurred. No evidence, at trial or in this post-conviction proceeding, suggested that any of the charged offenses were alleged to have occurred on any occasion when C.H. could have observed that they were occurring. Indeed, as noted by the Court of Appeals, A.B. took pains to prevent C.H. from finding out about the abuse [*id.*, ¶ 5].

7. A.B.'s testimony does include two specific mentions of fairly striking events, at least tangentially relevant, that C.H. might arguably have been expected to remember if she had observed them. One is the incident in which, A.B. testified, Petitioner poured hot water on her while she was sleeping in C.H.'s room; the other is the incident in which, A.B. testified, she screamed when Petitioner was beginning to engage in sexual intercourse with her, and soon afterward she told C.H. that she had merely stubbed her toe [Findings of Fact, ¶ 5]. Had C.H.'s testimony that she did not remember these incidents been presented at trial, the jury conceivably might have found that C.H. did not observe these events and therefore they might not have happened as related by A.B. On the other hand, the jury might simply have found that the memory of C.H. (who remembered nothing relevant) was not nearly as good as that of A.B. (who testified about her detailed memory of a very large number of events). For the following reasons, in view of the evidence presented at trial as a whole, there is no reasonable probability that C.H.'s testimony would have affected the outcome if presented at trial.

8. Like A.B. at the time of the 2012 DCS investigation, Petitioner "denied everything" at trial as to alleged abuse of A.B. – but he did not stop there. His testimony [Findings of Fact, ¶ 11] suggested possible exculpatory explanations (and sometimes

a remarkable lack of memory) regarding his own actual or apparent conduct, as well as a possible motive for A.B. to testify falsely, and a possible alternate perpetrator of the alleged abuse. Interpreting Petitioner's testimony in such a way as to emphasize the portions with maximum purported exculpatory significance, one might fairly summarize that testimony and its implications as follows. Petitioner was simply acting like a concerned parent, in lieu of A.B.'s father who failed to do so. A.B. needed intensive supervisions, and Petitioner provided it by intensive calling and texting, as well as illustrating what she was not to do. A.B. became highly displeased when Petitioner disciplined her. Being a "drama queen", A.B. retaliated for the discipline by going all out to discredit Petitioner and put him in prison for a very long time, by fabricating an extremely detailed account of abuse occurring over many years. Being also a skillful phone-programmer, perhaps she altered the content of his text messages to make it falsely appear that he had used language such as "shitty sucker," "used and dirty tampon," "Where is my pic," "Dumb ass," "When you get ready for bed [I] come and get you," and so on, which would appear to be inconsistent with rational parental or pseudo-parental discipline. (Petitioner did not suggest any explanation, however, for the voice mail messages containing expressions such as "love of my life," "You're my baby, I can't live without you," and the like.) Because her real father did not discipline her, in contrast, A.B. was willing to overlook her father's obsession with her; indeed, perhaps she did not invent her account of Petitioner's abuse, but simply alleged that Petitioner had done what her father had really done, all because of her vindictive outrage at Petitioner for disciplining her.

9. Petitioner claims his case was a "he said, she said" case, and "essentially a credibility contest between Hogan and A.B." Petitioner's Brief, at 6. What "he said" was basically that (1) A.B. was lying about everything because she was displeased about being disciplined, (2) Petitioner did not know whether he had sent objectionable texts to her or not, and (3) A.B.'s father,

not Petitioner, was obsessed with A.B. In order to find that Petitioner's testimony created a reasonable doubt as to his guilt, the jury would have had to reach one of two remarkable and highly improbable conclusions. Either the "drama queen" A.B. might have displayed exceptional creativity and skill in fabricating her entire account and forging objectionable text messages to be attributed to Petitioner or else A.B. might *not* have fabricated her account in its entirety, but simply substituted Petitioner for her father as the perpetrator – and forged objectionable text messages to be attributed to Petitioner.

10. Furthermore, any minimal credibility that what "he said" might have had, when considered simply in contrast to what "she said," would have been entirely destroyed by other evidence, even if C.H. had testified at trial. Petitioner's explanation of why he called and texted A.B. at school so often – that he needed to supervise her closely because she was "missing a lot of time" from school and getting into many fights – was contradicted by A.B.'s guidance counselor, her science teacher, and her school principal [Findings of Fact, ¶ 12]. This conduct on Petitioner's part was not common, even for a real parent [*id.*]. Petitioner had no explanation or denial of calling A.B. about 35 times a day, texting her all day long, and sending frequent messages to her Facebook page while she was in Florida, as reported by A.B.'s mother [*id.*, ¶ 5]. Another real parent, [H.'s] mother Bridgette [*id.*], found Petitioner's constant calling (while A.B. was *not* at school) to be "creepy" and observed that Petitioner acted like a jealous boyfriend, not a father figure. Petitioner did not explain, and could not well have denied, his voice mail messages containing expressions such as "love of my life" [*id.* ¶ 12] and "You're my baby, I can't live without you" [*id.*, ¶ 5]. The evidence of Petitioner's text messages, containing additional unsuitable expressions, was not really called into question by anything other than Petitioner's baseless suggestions and his claimed lack of memory [*id.*, ¶ 11]. No evidence cast doubt upon A.B.'s prior consistent statement that Petitioner had molested her, as reported by her friend [H.], nor upon her friend [B.'s]

personal observations of improper touching and her report that A.B. immediately identified Petitioner as the sender of the indecent picture seen by [B.] [*id.*, ¶ 12]. In short, the great weight of evidence, other than what "he said" or "she said," was strongly consistent with what "she said." That evidence established that Petitioner was a fake father figure, obsessed with A.B. in a manner entirely consistent with A.B.'s allegations.

11. For the reasons stated above, C.H.'s testimony would have had little or no tendency to affect the outcome if presented at trial. The jury would most likely have found that A.B.'s memory was simply much better than that of C.H., explaining why A.B. remembered the events in question and C.H. did not. Even if C.H.'s testimony had cast doubt upon the two parts of A.B.'s testimony specified above [Conclusions of Law, ¶ 7], those parts were minor and tangential in relation to A.B.'s entire account. There is no reasonable probability that the jury would have concluded that the two specified events did not occur as narrated by A.B. – and, even if the jury had somehow drawn that unlikely conclusion, there is no reasonable probability that the jury would have concluded that A.B. was lying about Petitioner's commission of the charged offenses.

12. Indiana law does not allow a judge to accept a plea of guilty when the defendant both pleads guilty and maintains his innocence at the same time, but does allow a judge to accept a plea of guilty from a defendant who maintained his innocence at a *previous* time, even very shortly before the defendant ultimately entered the guilty plea. *See Frazier v. State*, 490 N.E.2d 315 (Ind. 1986); *Bland v. State*, 708 N.E.2d 880 (Ind. Ct. App. 1999). Attorney Bolinger did not recommend that Petitioner should try to plead guilty while maintaining his innocence at the same time, but did suggest that Petitioner should change his mind about whether to continue to maintain his innocence in view of the strength of the evidence against him, the risk going forward, and the benefit available through acceptance of the plea agreement [Findings of Fact, ¶ 9]. In any event, as Petitioner did not accept

the State's plea offer, Attorney Bolinger's recommendation that he accept the offer ascertainably had no effect on the outcome of the original proceeding, and therefore resulted in no prejudice to Petitioner's defense.

13. A claim of prosecutorial misconduct requires a determination (1) that there was misconduct by the prosecutor, and (2) that it had a probable persuasive effect on the jury's decision. *Cox v. State*, 696 N.E.2d 853, 859 (Ind. 1998)[, *reh'g denied*]. Petitioner alleges that the State engaged in misconduct by failing to disclose the 2012 DCS report and failing to establish a proper chain of custody for Petitioner's handcuff key. Neither instance of alleged misconduct had any probable persuasive effect on the jury's decision. Had the 2012 DCS report been unquestionably disclosed and had it been used at trial, it would have been merely cumulative of A.B.'s own acknowledgment that she "denied everything" in 2012 [Findings of Fact, ¶ 7]. The jury would not have been persuaded to disbelieve A.B.'s account of the charged offenses by documentary evidence indicating that A.B. was telling the truth at trial when she said she "denied everything" in 2012. . . . Because a claim of prosecutorial misconduct would have had no merit, Attorney Bolinger cannot be found ineffective for failing to raise such a claim. *Vaughn v. State*, 559 N.E.2d 610, 615 (Ind. 1990) (counsel will not be deemed ineffective for failing to present a meritless claim).

14. As may be seen above, the probability that Attorney Bolinger's various claimed errors affected the outcome of Petitioner's trial is as follows: custody dispute, none [Conclusions of Law, ¶ 4]; 2012 DCS report, none [*id.*, ¶ 5]; C.H.'s testimony, little or none [*id.*, ¶¶ 6-11]; plea agreement, none [*id.*, ¶ 12]; prosecutorial misconduct, none [*id.*, ¶ 13]. Taken together, the effect of the claimed errors falls far short of amounting to a reasonable probability of a different outcome, sufficient to undermine confidence in the outcome of Petitioner's trial. Attorney Bolinger therefore cannot be found ineffective, and Petitioner is not entitled to post-conviction relief.

Appellant's Appendix Volume II at 119-136.

### Discussion

[11]     The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[12]     To prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[13] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

[14] Hogan argues that he received ineffective assistance of trial counsel because his counsel attempted to convince him to take a plea agreement despite knowing he

maintained his innocence, failed to obtain and utilize the 2012 DCS report, failed to subpoena C.H. to testify at trial or present her taped statement, and failed to utilize evidence regarding the custody battle as a circumstance leading to the criminal charges against him.

A.    *Guilty Plea*

The United States Supreme Court has held that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145, 132 S. Ct. 1399, 1408 (2012). Hogan's trial counsel testified there was a plea offer by the State of forty years and he advised Hogan that, after reviewing the evidentiary package, there was a substantial risk to him to go forward with trial and he could face a "very, very lengthy jail time." Post-Conviction Transcript Volume II at 36. Hogan did not accept the plea agreement. We cannot say Hogan demonstrated his trial counsel's performance was deficient or he was prejudiced.

B.    *DCS Report*

Hogan asserts the 2012 DCS report indicates A.B. denied being molested by him. The 2012 DCS report contained an allegation that Hogan grabbed A.B. in the groin and breast area and that A.B. denied the allegation. As pointed out by the post-conviction court, A.B. testified at trial that there were allegations against Hogan in 2012, stated that she initially denied everything, and described telling her counselor what happened because she could not "take this

anymore." Trial Transcript Volume I at 175. When asked why she initially denied the allegations against Hogan, she answered:

> He made so many threats to me, and I was scared. I don't know. He always told me that he would kill my dad, he would send me back to Florida with my mom, that's the big one. He would end [sic] me back to Florida with my mom or he would always make it, if I ever did tell he would make it look like I did it, like it was my fault.

*Id.* at 175-176. She also testified that her mother was a "really bad mom" and "an abuser" and she loved her father "with all [her] heart." *Id.* at 176.

[17] During the post-conviction hearing, the following exchange occurred during the direct examination of Hogan's trial counsel:

> Q Okay, and in fact you had seen [the 2012 DCS report], is that something that you should have used?
>
> A I don't think it would have changed the course of the battle plan.
>
> Q The fact that the same complaining witness previously was interviewed and said nothing happened to her?
>
> A I would still stick with that line. She also attested, if my memory serves correctly that for many years while the conduct ensued prior to the DCS investigation –

Post-Conviction Transcript Volume II at 52. Hogan's trial counsel also stated that A.B. "also attested that during, when she was three until she turned thirteen she denied all of the conduct until she broke down at school . . . ." *Id.* at 53. Under the circumstances, we cannot say reversal is warranted on this

basis. *See Chupp v. State*, 509 N.E.2d 835, 838-839 (Ind. 1987) (defense counsel's failure to present exculpatory statement by victim not ineffective assistance where victim made same statement in court under oath); *Williams v. State*, 508 N.E.2d 1264, 1268 (Ind. 1987) ("counsel's failure to present exculpatory evidence may not constitute ineffective assistance where that evidence is introduced to the jury through other witnesses").

To the extent Hogan asserts that the State's failure to include the 2012 DCS report was a violation of Brady v. Maryland, 373 U.S. 83 (1963), and violated his right to due process, we observe under Brady that the State has an affirmative duty to disclose material evidence favorable to the defendant. State v. Hollin, 970 N.E.2d 147, 153 (Ind. 2012). "To prevail on a Brady claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." Id. (quoting Minnick v. State, 698 N.E.2d 745, 755 (Ind. 1998) (citing Brady, 373 U.S. at 87, 83 S. Ct. 1194), reh'g denied, cert. denied, 528 U.S. 1006, 120 S. Ct. 501 (1999)). Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. The State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence. Stephenson v. State, 864 N.E.2d 1022, 1057 (Ind. 2007), reh'g denied, cert. denied, 552 U.S. 1314, 128 S. Ct. 1871 (2008). As mentioned above, the 2012 DCS report, which contained an allegation that Hogan grabbed A.B. in the

groin and breast area, indicated that A.B. denied the allegation. The record contained cumulative evidence including A.B.'s testimony that there were allegations against Hogan in 2012 and that she initially denied everything. Further, the record reveals Hogan's trial counsel was aware of the DCS investigation into Hogan. We again cannot say reversal is warranted on this basis.

### C.  *C.H.'s Testimony*

Hogan argues that his trial counsel was ineffective for failing to subpoena C.H. or present her taped statement. He notes that C.H. stated in her telephonic deposition that she claimed she would sleep on the floor while A.B. and Hogan were in the bed and this contradicted her taped statement in which she stated that A.B. did sometimes sleep in the bed with Hogan but she, C.H., would always sleep in the middle. He contends, "[h]ad C.H. been called to testify at trial, she could have clarified this inconsistency and repeated the exculpatory evidence contained in both statements." Appellant's Brief at 20.

Generally, deciding which witnesses to call is the "epitome of a strategic decision," *Wrinkles v. State*, 749 N.E.2d 1179, 1200 (Ind. 2001), *cert. denied*, 535 U.S. 1019, 122 S. Ct. 1610 (2002), and such decisions are insufficient to establish ineffective representation. *See Kelly v. State*, 452 N.E.2d 907, 910 (Ind. 1983). "When ineffective assistance of counsel is alleged and premised on the attorney's failure to present witnesses, it is incumbent upon the petitioner to offer evidence as to who the witnesses were and what their testimony would

have been." *Lee v. State*, 694 N.E.2d 719, 722 (Ind. 1998) (quoting *Lowery v. State*, 640 N.E.2d 1031, 1047 (Ind. 1994) (citing *Wallace v. State*, 553 N.E.2d 456 (Ind. 1990), *cert. denied*, 500 U.S. 948, 111 S. Ct. 2250 (1991)), *cert. denied*, 516 U.S. 992, 116 S. Ct. 525 (1995)), *cert. denied*, 525 U.S. 1023, 119 S. Ct. 554 (1998).

[21]  At trial, A.B. testified that she would sleep in Hogan's bed when she spent the night at his residence and C.H. would sometimes sleep in his bed and sometimes she would sleep in her room when Hogan kicked her out of the room. S.P. testified that she was A.B.'s friend, she spent thirty or forty nights at Hogan's residence, and she slept with A.B. and Hogan in his bed. B.S. testified that she was A.B.'s friend, she spent the night at Hogan's residence with A.B., she slept on the couch, in a bed next to Hogan's room, or in the bed, sometimes A.B. would sleep with her, and sometimes she would wake up and A.B. would be gone.

[22]  While Hogan's trial counsel indicated a belief that C.H. would have been a witness favorable to Hogan, when asked to explain, he answered: "She may have attested that the allegations that A.B. made never occurred. But at the same time she was never notified of those, what I'll call contacts, or allegations, so when asked point blank in her deposition, she simply responded as I read down the list of allegations that that's how she responded." Post-Conviction Transcript Volume II at 42. When asked if he remembered whether there was any effort to subpoena C.H. for trial, he answered that he did not recall.

[23] We observe that Hogan did not present C.H.'s testimony at the post-conviction hearing.[2] We cannot say that Hogan's assertion that C.H. could have clarified the inconsistency between her telephonic deposition and her recorded statement demonstrates prejudice. During the taped interview, C.H. stated A.B. visited her, A.B. had her own room but slept on the couch a lot, A.B. sometimes slept in Hogan's room, and they slept on the floor or on the bed when they slept in Hogan's room. When asked if there were ever times when A.B. slept in Hogan's room without her, she answered in the negative. She indicated there were times when A.B. slept in the bed with Hogan but she, C.H., would get in the middle. We cannot say the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

D. *Custody Battle*

[24] With respect to trial counsel's failure to investigate, Hogan asserts that the circumstances included his involvement in a bitter custody battle with Mother over C.H., the custody battle also involved A.B.'s biological father, and both men employed Attorney Tourkow who successfully fought for Hogan and A.B.'s biological father to have custody of their respective daughters. He argues

---

[2] At the hearing, Hogan's counsel asserted that C.H. was currently residing in Florida "so we can't even get a subpoena because we're not a party to the Uniform Interstate Depositions and Discovery Act, so even if we asked the Court to issue a subpoena it wouldn't do any good because we wouldn't be able to enforce it." Post-Conviction Transcript Volume II at 75. On appeal, Hogan does not develop an argument under the Uniform Interstate Depositions and Discovery Act.

that A.B.'s father stated to DCS in 2012 that Hogan had always been a great caregiver to A.B. and A.B.'s father told DCS that he believed somebody made up the false allegations because they were mad that he obtained full custody of A.B.

[25] At trial, A.B.'s father testified that he had been friends with Hogan, he helped Hogan obtain a job, and he allowed A.B. to spend time with Hogan and C.H. because he "thought he always would take care of her and be there for her." Trial Transcript Volume II at 456. On cross-examination, A.B.'s father testified that he knew Hogan for thirteen years before the allegations and felt safe and secure during that period and trusted Hogan with A.B. Further, A.B. referred to the "custody battle" at trial. Trial Transcript Volume I at 166.

[26] During the post-conviction hearing, Hogan's post-conviction counsel mentioned the custody battle during direct examination of Hogan's trial counsel. When asked if the State opens the door to be able to make arguments when a State's witness brings up a custody battle, Hogan's trial counsel stated: "Can, and sometimes when you make those arguments, it blows up in your face." Post-Conviction Transcript Volume II at 54. In light of the custody battle referenced at trial, the testimony of A.B.'s father, and the testimony of Hogan's trial counsel regarding the decision not to further discuss the custody battle, we cannot say that the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

For the foregoing reasons, we affirm the denial of Hogan's petition for post-conviction relief.

Affirmed.

Baker, J., and Riley, J., concur.